YM

**FILED**

**FEBRUARY 28, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**08 C 1219**

| | | |
|---|---|---|
| ROGER E. COVEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. |
| v. | ) | |
| | ) | |
| DEUTSCHE BANK AG; DEUTSCHE | ) | |
| BANK SECURITIES, INC., d/b/a | ) | |
| DEUTSCHE BANK ALEX. BROWN, | ) | JURY TRIAL DEMANDED |
| PRESIDIO ADVISORS, L.L.C., and | ) | **JUDGE BUCKLO** |
| PRESIDIO ADVISORY SERVICES, INC., | ) | **MAGISTRATE JUDGE BROWN** |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Roger E. Covey hereby complains against Deutsche Bank AG ("Deutsche Bank AG"), Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex. Brown, a division of Deutsche Bank Securities, Inc. ("DBSI"), Presidio Advisors, L.L.C. ("Presidio LLC"), and Presidio Advisory Services, Inc. ("Presidio Inc."),[1] and in support states as follows:

### NATURE OF THE ACTION

1.     This case arises out of defendants' participation in a conspiracy to create, market, sell, and implement an illegal tax shelter named "Offshore Portfolio Investment Strategy" or ("OPIS") to plaintiff in the years 1998 and 1999.  Defendants, in concert with accounting firm KPMG and law firm Brown & Wood, first approached Covey in 1998 and offered him what they said was a legitimate transaction under the federal tax code.  Each of the defendants and co-conspirators played roles in the creation, marketing, sale, and/or implementation of OPIS.  All committed wrongful acts in furtherance of the conspiracy.

---

[1] Deutsche Bank AG and DBSI are collectively referred to herein as the Deutsche Bank defendants.  And Presidio LLC and Presidio Inc. are collectively referred to herein as the Presidio defendants.

2.      For example, defendants and their co-conspirators made or endorsed representations that:

(a)      The capital and/or ordinary losses created by the shelter were legitimate, proper and in accordance with all applicable tax laws, rules, and regulations;

(b)      The design of the transaction made economic and investment sense, could generate a profit and therefore had business purpose and economic substance;

(c)      The legitimacy of the shelter would be verified by a legal opinion provided by a respected and purportedly independent "Wall Street" firm; and

(d)      The defendants and other co-conspirators were acting independently from one another and had not unlawfully coordinated their actions with respect to OPIS.

3.      In reality, the co-conspirators, including each of the defendants, knew or recklessly disregarded that their representations were materially false and misleading. They knew OPIS lacked economic substance. They knew or recklessly disregarded that OPIS should have been, but was not, registered with the IRS as a potentially abusive "tax shelter" and that it was not "more likely than not" that it would be approved by the IRS if the IRS were privy to the details of the tax strategy. They also knew that, even before Covey and other OPIS participants agreed to participate, the co-conspirators had agreed amongst themselves on all material transactions that would occur during the execution of the tax strategy. In particular, the Presidio defendants assured Covey that OPIS was valid, legitimate, and appropriate. And throughout the implementation of Covey's OPIS strategy, the Presidio defendants continued to give Covey the same impression. They acted like financial advisors giving Covey advice about OPIS, and continued to act like OPIS was an investment. Moreover, the Deutsche Bank defendants at all times gave Covey the impression that the trading and other financial machinations underlying

OPIS were valid and legitimate. They did this, in part, by preparing and circulating to Covey certain documents, including account agreements and account statements. In reality, OPIS was not a legitimate investment—it was not even a legitimate tax strategy—and defendants knew it. Defendants and the other co-conspirators nonetheless participated in the OPIS conspiracy and reaped tens of millions of dollars in illicit profits at the expense of Covey and other tax shelter participants.

4.     Covey reasonably relied on the advice and actions of the co-conspirators, who were widely considered to be some of the most well respected firms in their fields, in agreeing to participate in OPIS. Defendants and their co-conspirators artificially generated substantial tax losses for Covey, though no real losses ever occurred and though there was never any real economic risk involved in the transactions. This loss was deducted from Covey's taxable income and generated significant tax savings.

5.     Defendants knew that in light of the well-established legal doctrine disallowing the recognition of losses from transactions that lacked "economic substance," the tax shelters would not withstand an audit by the IRS. Not only was this "economic substance doctrine" established in case law, it was also confirmed in several IRS Notices, including IRS Notice 99-59 and 2000-44. Throughout the implementation of OPIS, however, defendants and the other co-conspirators continued to maintain the illusion that OPIS (including the underlying trading strategies) was a valid and legitimate investment with substantial tax benefits.

6.     Eventually, Covey was audited by the IRS. As part of the audit, the IRS found that Covey had entered into an illegal tax shelter for the year 1998. The IRS assessed taxes and interest for that year, and a settlement for those amounts was reached and executed in 2003.

(Fortunately, because Covey participated in an amnesty program by disclosing to the IRS his participation in OPIS to the IRS, Covey was allowed 20% of the tax benefit from OPIS.)

7.    As a result of their illicit activities, in August 2005, KPMG agreed to pay the federal government $456 million as part of a deferred prosecution agreement relating to its development of certain fraudulent tax shelters, including OPIS.  In connection with the deferred prosecution agreement, KPMG admitted, among other things, that from 1996 to 2002, a number of KPMG tax partners engaged in conduct that was unlawful and fraudulent in relation to OPIS and other tax shelters, including (a) preparing false and fraudulent tax returns for shelter clients; (b) drafting false and fraudulent proposed factual recitations and representations as part of the documentation underlying the shelters; (c) issuing opinions that contained those false and fraudulent statements and that purported to rely upon those representations, although the KPMG tax partners knew they were not true; and (d) actively taking steps to conceal from the IRS these shelters and the true facts regarding them.

8.    Moreover, a number of employees of the co-conspirators have been indicted by a grand jury in the Southern District of New York.  In an October 17, 2005 superseding indictment, for example, in what it described as the "largest criminal tax case ever filed," the Department of Justice filed a variety of criminal charges arising from certain tax strategies, including OPIS, and similar fraudulent schemes.  Among the charges, which were brought against nineteen individuals, were conspiracy to defraud the IRS, tax evasion, and obstruction of the IRS for devising, marketing, and implementing fraudulent tax shelters, including OPIS. Those indicted included several former KPMG partners, a former partner at Brown & Wood, and the three people who effectively controlled Presidio, including John Larson.  (As detailed below, John Larson was directly involved in pitching OPIS to the Covey.)

4

9.      Among other things, the indictment charged that the defendants: (a) concocted tax shelter transactions and false and fraudulent factual scenarios to support them; (b) prepared false and fraudulent documents, including engagement letters, transactional documents, representation letters, and opinion letters; (c) prepared and provided to their clients false and fraudulent representations that the clients were required to make in order to obtain opinion letter that purported to justify the phony tax shelter losses to offset income or gain; and (d) prepared and caused to be prepared tax returns that were false and fraudulent because they incorporated the phony tax losses and therefore substantially understated the tax owed by the clients.

10.     On December 21, 2006, KPMG partner Chandler S. Moisen pled guilty to tax fraud charges arising out of the government's investigation.  According to the criminal information against him, Moisen's co-conspirators included senior persons at KPMG and Presidio.  In connection with his plea, Moisen admitted that he sold OPIS, despite his knowledge that it was a fraudulent tax shelter; required clients to sign representations drafted by KPMG, despite his knowledge that the representations were false because they described the transactions as long-term and leveraged when they were actually short-term and unleveraged; and prepared and signed false KPMG opinion letters.

11.     As of the date of this complaint, the federal criminal investigation of Deutsche Bank relating to its role in the fraudulent tax shelter scheme is believed to be ongoing.

12.     In addition to these criminal indictments, pleas, and investigations, on June 2, 2006, a court in the District of New Jersey certified a class for settlement purposes of taxpayers who purchased tax strategies, including OPIS.  *Simon v KPMG LLP*, Civ. 05cv03189 (D.N.J.). The *Simon* court also issued, on that date, its final approval of a class settlement in which KPMG and Brown & Wood agreed to pay approximately $178 million arising from their roles in the

fraudulent tax shelter scheme. Covey was a class member for purposes of this settlement, and as detailed below, received a portion of the settlement fund.

13.     As a result of the conspiracy alleged herein, Covey suffered considerable losses, including but not limited to paying back taxes, penalties and substantial professional fees. Based on these facts, and as more fully detailed below, Covey seeks recovery for back taxes, interest, fees and costs against defendants for conspiracy, common law fraud, negligent misrepresentation, violation of the Illinois Consumer Fraud & Deceptive Trade Practices Act, and assisting in KPMG and Brown & Wood's breaches of fiduciary duty.

<u>**PARTIES**</u>

14.     Plaintiff Roger Covey is an individual residing in Evanston, Illinois.

15.     Defendant Deutsche Bank AG is a German corporation with its principal place of business at Taunusanlage 12, 60325 Frankfurt am Main, Germany. Deutsche Bank AG is the largest bank in Germany and one of the largest banks in the world with 2006 profits of $5.9 billion Euros ($8.6 billion) on revenues of $18.7 billion Euros ($27.4 billion). Deutsche Bank AG offers various investment, financial, and related products and services to consumer and corporate clients worldwide. Deutsche Bank AG has some 82,000 employees and more than 12 million customers in 75 countries worldwide. Deutsche Bank AG has a leading position in international foreign exchange, fixed-income and equities trading, and is a recognized leader in all aspects of foreign exchange. Deutsche Bank AG is one of the top global foreign exchange providers. Its only branch in the United States is located in New York City. Deutsche Bank AG has conducted business in Illinois sufficient to establish minimum contacts within the forum that support the exercise of jurisdiction over it by this Court. Notably, Deutsche Bank AG was involved in the creation and implementation of OPIS that forms the basis for the claims alleged

6

herein.  Deutsche Bank AG can be served via its counsel, Lawrence Hill, Dewey & LeBoeuf,

1301 Avenue of the Americas, New York, NY, 10019-6092.

16.    Upon information and belief, DBSI is a wholly-owned subsidiary of Deutsche

Bank and a member firm of the New York Stock Exchange.  DBSI was formed as the result of

Deutsche Bank's acquisition of BT Alex. Brown, Inc., the United States' oldest brokerage firm.

On information and belief, defendant DBSI is a Delaware corporation with its principal place of

business at 31 West 52nd Street, New York, New York, 10019.  DBSI is licensed to do business

in this state and has conducted business in Illinois sufficient to establish minimum contacts

within the State that support the exercise of jurisdiction over it by this Court.  DBSI has offices

in Cook County, Illinois and may be served via its counsel, Lawrence Hill, Dewey & LeBoeuf,

1301 Avenue of the Americas, New York, NY, 10019-6092.

17.    Defendant Presidio LLC is a Delaware limited liability company and has its

principal place of business located at 333 Hayes Street, Suite 200 San Francisco, CA 94102.

Presidio LLC is a registered investment advisor under the Registered Investment Advisors Act of

1940.  Like KPMG, Presidio LLC and its members acted as promoters of the fraudulent OPIS tax

shelter transaction and in so doing, Presidio LLC and its members directed communication into

the State of Illinois and otherwise conducted business herein sufficient to establish minimum

contacts within the forum that support the exercise of jurisdiction over it by this Court.  Presidio

LLC can be served with process by serving its registered agent Steven Buss, 333 Hayes Street

#200 San Francisco, CA 94102.

18.    Defendant Presidio Inc. is a Delaware corporation organized under the laws of

Delaware with its principal place of business at 333 Hayes Street, Suite 200, San Francisco,

California  94102.  Presidio Inc. is a Manager of Presidio LLC.  Presidio Inc. acted as promoters

7

of the fraudulent OPIS tax shelter transaction and in so doing, Presidio Inc. directed communication into the State of Illinois and otherwise conducted business herein sufficient to establish minimum contacts within the forum that support the exercise of jurisdiction over it by this Court. Presidio Inc. can be served with process by serving its registered agent, The Corporation Company, 1675 Broadway, Denver, Co 80202.

19.    Defendants and the other co-conspirators engaged in multiple OPIS transactions and similar fraudulent transactions and, in doing so, acted in concert according to a prearranged and commonly understood and accepted plan or scheme described herein pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Covey and other OPIS participants. Moreover, defendants and the other co-conspirators made multiple false statements of material fact, and omitted to state material facts which made statements misleading to Covey. In so doing, defendants were acting mutually and as the agents of one another.

## NON PARTY CO-CONSPIRATORS

20.    KPMG LLP ("KPMG") is a limited liability partnership with its principal place of business in New York, New York. It is a member of KPMG International, a public accounting firm. KPMG is known as one of the "Big Four" accounting firms in the United States. KPMG is incorporated in Delaware, maintains its headquarters in New York and has numerous offices in the United States and other countries, including in Chicago.

21.    Robert Pedersen was a KPMG partner in Chicago. Pedersen was first to approach Covey about participating in OPIS. Pedersen met with Covey several times concerning OPIS. Upon information and belief, Pedersen is a resident of Illinois.

22.     John Larson is a principal of the Presidio defendants.  Larson was directly involved in the marketing of OPIS to Covey, participating in at least one in-person meeting with Covey in Chicago.  As described above, Larson has been indicted and is currently being prosecuted for, among other things, tax fraud.  Upon information and belief, Larson is a resident of California.

23.     Brown and Wood LLP was a large and highly respected law firm, which focused on complex financial transactions.  From at least mid-1996, Brown & Wood was organized as a New York limited liability partnership headquartered in New York, New York.  In May 2001, Brown & Wood merged with another major law firm, Sidley Austin, to become Sidley Austin Brown & Wood LLP, one of the largest law firms in the country, which is headquartered in Chicago.  On January 1, 2006, the firm changed its name to Sidley Austin LLP.  The firm is referred to herein as Brown & Wood.

JURISDICTION AND VENUE

24.     Covey is a citizen of Illinois, Deutsche Bank AG is a citizen of Germany, DBSI is a citizen of New York or Delaware, Presidio LLC is a citizen of Delaware or California, Presidio Inc. is a citizen of Delaware or California, and there are millions of dollars at issue in this case.  Thus, pursuant to 28 U.S.C. §1332, this Court has jurisdiction over this matter because there is complete diversity between the parties and the amount in controversy is in excess of $75,000.

25.     This Court has personal jurisdiction over defendants, which either (a) have offices in Illinois and are continuously and systematically engaged in business here; (b) traveled to Illinois and/or communicated with Covey (who was living in Illinois) with respect to this transaction such that they could reasonably expect that personal jurisdiction would be

appropriate in this Court, and/or participated in a conspiracy to engage in wrongful or tortious conduct in Illinois.

26.     Pursuant to 28 U.S.C. §1391, venue is appropriate in this district because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Illinois.

<u>BACKGROUND</u>

I.      <u>THE FRAUDULENT TAX SHELTER SCHEME</u>

      A.     <u>Tax Shelters in General</u>

27.     A tax shelter is a method or device used to reduce or eliminate tax liability. Some tax shelters advance a legitimate endeavor and are therefore lawful. Illegitimate or abusive tax shelters are those in which a significant purpose is the avoidance or evasion of taxes in a manner not intended by law. The IRS deems a shelter unlawful if its economic purpose is tax avoidance.

28.     Economic substance is synonymous with risk—a deal has economic substance if there's a chance that the taxpayer could lose their investment. If the outcome of a tax shelter is preordained, however, there is no risk. Under such circumstances, the shelter is unlawful.

29.     Abusive tax shelters can be custom-designed for a single user or prepared as a generic tax product sold to multiple clients. The OPIS tax shelter complained of herein was sold to multiple clients, including Covey. Astonishing amounts of money can be made from such a shelter. Once a "template" or "cookie cutter" opinion is written, additional deals can be done as fast as they can be sold.

30.     The essence of the co-conspirators' fraudulent scheme was that they claimed that they had developed an "investment strategy" that had a reasonable likelihood of generating

10

profits, but if not, any losses generated could be used to legally offset other taxable gains. The co-conspirators aggressively marketed this "investment strategy" to Covey and others who generally lacked the sophistication to understand the enormously complex transactions that were required to consummate the strategy. A typical target for sale of an OPIS transaction was someone who had sold a business or a substantial position in a business, realizing a substantial capital gain on the sale. Generally, when a taxpayer suffers a loss in a particular investment, the taxpayer can use that loss to reduce any taxable gains made from separate investments. Thus, as explained by the co-conspirators, if the tax strategy generated losses, those losses could be used to offset gains that Covey or others had otherwise realized.

31.    According to a 2005 Senate Report, described more fully below, "OPIS . . . required the purchaser to establish a shell corporation, join a partnership, obtain a multi-million dollar loan, and engage in a series of complex financial transactions that had to be carried out in a certain order and in a certain way to realize tax benefits." However, unbeknownst to Covey, the highly complex financial transactions that were integral to the fraudulent tax shelters were in fact sham transactions that were designed to create a veneer of economic substance, while at the same time guaranteeing that Covey would suffer a substantial loss that would offset otherwise taxable gains.

32.    The Covey had virtually no role or discretion in the execution of his OPIS transaction. In each and every OPIS transaction set up and controlled by the co-conspirators, the investor lost money based upon an artificial tax basis resulting from the complex operation of the transaction.

33.    According to the Senate Report, OPIS was sold by KPMG to hundreds of individuals. Covey (and presumably these other participants) relied upon the advice, reputation,

and material misstatements of the co-conspirators in deciding to participate in what he believed to be a legitimate "investment strategy."

B.    Terminology

34.    There are a number of different ways one can invest in securities.  In one of the simplest types of transactions, an individual or an entity can purchase a security outright.  In this instance, the purchaser is considered "long," and can only profit by an increase in the price of the purchased security.  Alternatively, the investor can borrow the security, sell it immediately, expecting the price of the stock to drop, and then buy it back to repay the loan.  In this case, the purchaser is considered "short," and can only profit by a decline in the market price of the borrowed security.

35.    An option, on the other hand, is not an outright purchase.  Instead, it gives a buyer the right to buy or sell a security at a definite price for a definite period of time, regardless of that item's future market price on the open market.  That security may be stocks, bonds, commodities, or intangible market valuations such as the Standard & Poors' Index.  Options are said to be "in the money" if the market price of the underlying security makes exercising the option profitable.  Similarly, options are said to be "out of the money" when exercising the option would result in no gain or loss.

36.    An option position is "long" if the holder's profit is dependent on a rise in the value of an underlying item, while an option position is "short" if the holder's profit is dependent on a decrease in the value of any underlying item.

37.    Options are said to be "covered" when the seller of the option owns the item against which the option is made.  Correspondingly, an option is "naked" when the seller does not own the item against which the option is made.

38.    Options may also be either "American" or "European." The key difference between American and European options relates to when the options can be exercised. A European option may be exercised only at the expiration date of the option, *i.e.*, at a single pre-defined point in time. An American option, on the other hand, may be exercised at any time before the expiration date.

39.    For example, an investor buys a "call" option on 1,000 shares of ABC stock with a "strike price" of $100 and an expiration date of July 16, 2003. This option gives the investor the right to purchase 1,000 shares of ABC for $100. Under the American option, the option holder can exercise the option by purchasing the shares at any time he chooses prior to July 16, 2003. Under a European option, the option holder can only elect to exercise the option on July 16, 2003.

40.    European option contracts are "digital" in the sense that the investor wins or loses a pre-determined amount in full, but only if the strike price is met. Thus, the option is either "on" or "off," like a digital (binary) 1 or 0. As a result, European digital options contracts provide an investor with the same payout no matter how far the value of the underlying item rises above the strike price of the option. For example, a digital option may state that an investor will receive $1,000 if ABC Corp. closes at or above $12 per share on a certain date. If the price of ABC Corp is at or above $12 per share on the closing date, the investor is paid $1,000. If ABC does not close at or above $12 per share, the investor gets nothing and loses what he originally paid for the option. European digital options contracts are thus essentially wagers that a certain commodity or equity price will be above or beneath a given price on a certain date.

41.    European or digital options contracts are ordinarily less expensive to purchase than American or standard options, as the exposure of the seller and potential profit by the buyer

are limited to a pre-set amount that does not vary, regardless of the degree of fluctuation in the value of the underlying item.  An American option, by contrast, gives the holder a wider range of risk and profit potential.

42.     A "straddle" involves the use of offsetting positions in options contracts wherein the value of one position generally varies inversely with the value of the other position.

C.     Development of the OPIS Tax Strategy

43.     Traditionally, legitimate financial services firms provided tax advice to individual clients based on the client's specific circumstances, normally charging by the hour.  Respected firms did not encourage their clients to participate in tax shelters, even though such shelters can be perfectly legal.

44.     In the mid-1990s the situation changed.  Key financial services firms began developing "cookie cutter" tax "products" that were really tax shelters.  Rather than responding to client needs, the sellers of these products would first create a scheme to avoid tax liability, and then induce clients to enter into the necessary transactions, on the representation that the product was a legitimate means of reducing taxes.  The transactions executed in the course of implementing a particular tax product were essentially identical.  The investor would provide the required fee and would then have little or no further involvement in the product beyond claiming the tax benefits the product's promoters asserted he was entitled to.

45.     The financial services firms had a strong incentive to sell such products.  Because a single product could be resold to multiple clients, they were far more profitable than traditional tax consulting.  Moreover, there was a widespread perception that the promoters of abusive or illegal shelters faced little risk of meaningful punishment.  IRS penalties for tax shelter promoters and those who assisted them were weak and ineffective.

14

46.     A document uncovered by U.S. Senate staff investigators provides a revealing glimpse of the cost-benefit analysis conducted by the co-conspirators. To combat abuses by promoters, the law requires that tax products such as OPIS be registered with the IRS.  KPMG and Presidio discussed whether they should comply with this requirement, according to evidence that emerged during the Senate investigation, but ultimately decided not to do so. In part, this was because a May 26, 1998 internal memorandum from Gregg Ritchie to Jeffrey Stein, the head of operations of KPMG's Tax Services Practice, entitled "OPIS Tax Shelter Registration," concluded that 'the penalties would be no greater than $14,000 per $100,000 in KPMG fees. . . . For example, our average deal would result in KPMG fees of $360,000 with a maximum penalty exposure of only $31,000."  The memorandum concluded that, "the rewards of a successful marketing of the OPIS product . . . far exceed the financial exposure to penalties that may arise."

47.     In addition, that May 26, 1998 memorandum concerning OPIS explained that anyone involved in OPIS would be jointly and severally liable for any penalty levied against KPMG for failure to register the OPIS tax shelter.  It identified Presidio, Deutsche Bank, and Brown & Wood, as OPIS participants who would be jointly and severally liable with KPMG.

48.     Individual taxpayers faced very different incentives than the financial services firms.  The IRS actively enforces a system of civil penalties for taxpayers found to have acted improperly that greatly exceeds, in terms of monetary liability, the exposure of the tax shelter promoters or implementers.  For example, taxpayers face a 0.5 percent per-month penalty (up to a 25 percent maximum) for delinquent payments (26 U.S.C. § 6651(a)(2)), a 5 percent per-month penalty (up to a 25 percent maximum) for delinquent filing (26 U.S.C. § 6651(a)(1)), a 20 percent penalty for underpayments caused by taxpayer negligence (26 U.S.C. § 6651(a)), and a 75 percent penalty for underpayments caused by fraud (26 U.S.C. § 6663(a)).  These penalties,

and the possibility of criminal prosecution, meant that a taxpayer found to have participated in an abusive tax shelter faced far greater negative consequences than did the promoters who sold him the tax product.

49.    The co-conspirators knew that OPIS purchasers, including Covey, might eventually face enormous tax penalties.  As an integral part of the fraud, each co-conspirator attempted to protect itself by structuring its relationship with Covey to minimize its liability to reimburse any future penalties.  For example, KPMG's engagement letter with Covey purported to limited KPMG's liability to $50,000.  The co-conspirators, however, never fairly and adequately disclosed to Covey and other participants the risks they faced.

50.    OPIS was, in part, developed through KPMG's "Tax Innovation Center," the sole purpose of which was to develop new tax products.  The Tax Innovation Center, run out of KPMG's Washington National Tax Practice, was designed to draw input from all of KPMG's tax professionals to further the development of new products.  In addition, it focused on measuring and improving the profitability of KPMG's tax products.

51.    A draft KPMG memorandum dated May 18, 2001 sets forth the history of KPMG's tax shelter practice, originally called the Capital Transactions Services ("CaTS") practice, and later renamed the Innovative Strategies ("IS") practice, and provides a summary of the development of OPIS.

52.    According to that memorandum, in 1997 Gregg Ritchie formed a CaTS around the Foreign Leveraged Investment Program (FLIP) capital loss strategy.  The initial revenue goal was $4 million and the practice delivered $11 million in fiscal 1998.  After calendar 1997, DPP [Department of Practice and Professionalism] retired the FLIP strategy leaving Ritchie (before his 1998 retirement from the Firm), Randy Bickham and Jeff Eischeid to work on a replacement

16

capital loss strategy, which became OPIS.  The fiscal 1999 IS revenue goal was $18 million and the practice delivered $28 million.  The practice's success was largely attributable to OPIS revenue generated in calendar 1998.

53.    KPMG determined that it needed to develop a replacement for FLIP after the head of its Department of Practice and Professionalism determined that it should cease marketing FLIP.  An internal KPMG email states that "the OPIS product was developed in response to…DPP tax's concerns over the FLIP strategy."  Indeed, a March 1998 KPMG email regarding the development of OPIS "identifies a host of significant technical flaws in FLIP," according to the 2003 Senate Subcommittee Report.  The IRS subsequently identified FLIP as a potentially abusive tax shelter.

54.    In a March 14, 1998 email, Jeff Stein, who became head of KPMG's tax services, referred to OPIS as the "son of FLIP."  However, KPMG knew that OPIS was not significantly distinct from FLIP.  For example, in a February 1998 memorandum regarding OPIS, a senior KPMG tax professional wrote "the only thing that really distinguishes OPIS (from FLIP) from a tax perspective is the use of an instrument that is purported to be a swap….  However, the instrument described in the opinion is not a swap under I.R.C. § 446."

55.    Each defendant and co-conspirator played a role in creating, marketing, selling, and implementing the OPIS transactions, including the transaction in which Covey participated.  All committed wrongful acts in furtherance of the conspiracy.

56.    After December 31, 1998, the co-conspirators ceased marketing OPIS to potential clients.

57.    Eventually, the IRS deemed OPIS to be a potentially abusive tax shelter.  Potentially abusive tax shelters are those that are the same or similar to "listed transactions," that

is, a transaction the IRS has formally determined as "having a potential for tax avoidance or evasion." The IRS requires that such tax shelters must be disclosed and registered with the IRS.

58.     OPIS was never registered with the IRS as a potentially abusive tax shelters. OPIS was not even marketed to Coveys as a tax shelter—it was an "investment strategy" with potential, material tax benefits, according to the co-conspirators—and the co-conspirators concealed from Covey their own concerns that these products were abusive tax shelters that would not be approved by the IRS.

D.     Marketing and Implementation of OPIS

59.     Both before and after Covey and others purchased OPIS, the co-conspirators represented to participants that OPIS was a legitimate tax avoidance mechanism and that it was not a fraudulent tax shelter. These representations were false and the co-conspirators knew them to be false (or were reckless in not knowing them to be false).

60.     As described more fully below, Covey and other participants relied on sales presentations made by some of the defendants and co-conspirators, who had a fiduciary relationship with the participant. The sales presentation was initially made by KPMG, Presidio, or both, acting on behalf of and for the benefit of all the co-conspirators.

61.     A key objective in each of these presentations was to convince the potential OPIS purchaser that the tax product was legitimate. The sales pitch relied heavily on KPMG, Brown & Wood, and Deutsche Bank's reputations for integrity and expertise and included explanations of how the tax laws purportedly allowed the benefits supposedly provided. The presentations also included promises that the legality of OPIS would be affirmed in formal opinions by KPMG and Brown & Wood. The writings, oral statements and visual presentations used by KPMG and Presidio to sell OPIS constituted an affirmative representation that OPIS was not a fraudulent tax

18

shelter.  In other words, the words and conduct of the co-conspirators intentionally caused Covey

and other OPIS purchasers to believe that, at the very least, there was a reasonable, good faith

legal basis to claim the advertised and promised tax benefits.

62.    At all times, however, the co-conspirators had a duty to disclose to Covey and

others the truth about the fraudulent nature of OPIS.  Such a disclosure was necessary so that

their representations about the tax products would not be false and misleading.  It was also

required because, as each defendant and co-conspirator knew, KPMG and Brown & Wood had

fiduciary relationships with Covey.  Nevertheless, no co-conspirator made such a disclosure.

63.    Included among the materially false and misleading representations and omissions

co-conspirators made to Covey were the following:

> (a)    Representing to Covey that OPIS was a legitimate investment strategy
> with tax benefits;
>
> (c)    Failing to disclose to Covey that the co-conspirators formed an alliance
> whose sole purpose was to develop, market, and implement tax products,
> such as OPIS, as investment strategies, when each of the co-conspirators
> knew that they were abusive tax products;
>
> (d)    Failing to disclose that the co-conspirators developed, marketed, and
> implemented the purported investment strategies, such as OPIS, for the
> sole purpose of generating fees;
>
> (e)    Failing to disclose that the co-conspirators were operating together, and
> not as independent entities, when they were developing, marketing, selling
> and implementing knowingly abusive tax shelters, such as OPIS;
>
> (f)    Failing to disclose that the co-conspirators knowingly traded on their
> reputations as respected members of their professions to induce Covey to
> purchase the purported investment strategies, such as OPIS, that the co-
> conspirators knew were abusive tax shelters;
>
> (g)    Representing that co-conspirators' fees were based on services rendered;
>
> (h)    Failing to disclose that the fees co-conspirators were collecting were
> unreasonable, excessive, and unethical;

19

(i)     Failing to disclose that the co-conspirators were splitting and/or sharing fees;

(j)     Failing to disclose that the opinion letters provided by co-conspirators in connection with the transactions were not issued independently;

(k)     Representing to Covey that the Brown & Wood opinion letter was an "independent" legal opinion from an "independent" law firm;

(1)     Representing to Covey that the opinion letters could be relied upon to protect Covey from incurring penalties and to satisfy the IRS as to the propriety of OPIS if audited;

(m)     Failing to advise Covey that the co-conspirators had already prepared "form" or "cookie cutter" opinion letters approving OPIS and that co-conspirators needed only fill in several blanks for each of the many clients to which they rendered such opinion letters across the country;

(n)     Failing to advise Covey that the co-conspirators were illegally promoting and selling unregistered tax shelters by marketing and selling OPIS;

(p)     Recommending, advising, instructing, and/or assisting Covey in the formation of the limited liability companies and partnerships to carry out OPIS;

(q)     Representing to, and advising Covey that the various entities formed to carry out OPIS had a business purpose and economic substance;

(r)     Making and endorsing the statements and representations in the opinion letters authored and signed by the co-conspirators;

(s)     Making and endorsing the statements and representations contained in co-conspirators' oral advice, instructions, recommendations, and the tax returns prepared by KPMG;

(t)     Failing to advise Covey of the roles the Deutsche Bank defendants played in OPIS, and the fees the bank received for assisting in and carrying out OPIS;

(u)     Recommending, advising, instructing, and assisting Covey in carrying out each of the steps of OPIS;

(v)     Failing to disclose that the majority of the principals of Presidio were former KPMG partners;

(w) Failing to disclose that the true purpose of OPIS was to generate fees for co-conspirators;

(x) Providing erroneous legal and tax opinions and advice, including representing that OPIS was not a tax shelter, but was a legitimate tax avoidance strategy, and were "more likely than not" to withstand IRS scrutiny; and

(y) Representing that the investment portion of OPIS (implemented by defendants, primarily the Deutsche Bank defendants) was valid, legitimate, and suitable for Covey, and had real economic purpose and potential benefit to Covey.

64.    These representations and omissions were materially false and misleading because, as each co-conspirator knew, or was reckless in not knowing, OPIS was an illegal tax strategy, as described herein.

65.    The false and misleading representations and omissions made to Covey are attributable to each of the co-conspirators because they were made by persons or entities acting as agents of, and in furtherance of, the conspiracy.  Moreover, each defendant committed wrongful acts in furtherance of the conspiracy.

66.    Covey reasonably relied upon the misrepresentations and omissions of co-conspirators, and was fraudulently induced to purchase OPIS. Absent these misrepresentations and omissions, Covey would not have entered into the OPIS transaction and, consequently, would not have suffered a loss.

67.    Prior to the sale of OPIS, the co-conspirators assisted in the drafting of prototype opinion letters and, as described in a June 1998 confidential e-mail from KPMG's Gregg Ritchie, a "product tool kit."  For example, in an internal KPMG email from Jean Monahan to Jeffrey Eischeid, dated February 23, 2000, Ms. Monahan inquires about when KPMG will receive Brown & Wood's OPIS opinion letter, saying that "[i]t is my understanding that for both BLIPS

and OPIS, B&W is using our opinion as the starting point for their opinion." The opinion letters contained numerous false statements, known to the co-conspirators that purported to explain why the investor was entitled to the claimed tax benefits.

68.    After the completion of the tax strategy, the co-conspirators provided virtually identical opinion letters to Covey. As one judge noted, "the Court finds these opinion letters to be boiler-plate templates that are almost, if not completely, identical except for date, investor name, investor advisor, and dates and amounts of investment transactions. There is little indication that these are independent opinion letters that reflect any sort of legal analysis, reasoned or otherwise." *Department of Justice Tax Division v. KPMG LLP,* No. 02-MC-295 (D.D.C.). The letters were also long and were practically incomprehensible.

69.    The opinion letters indicated that Presidio acted as "investment advisor" to the investor and that Presidio had "designed" an investment "strategy" (in the OPIS opinion letters).

70.    The opinion letters also asserted that the tax strategy was designed to allow significant profits by allowing the investors to significantly leverage their individual investments.

71.    Co-conspirators knew these statements were materially false and misleading because there was no investment program or strategy and it was virtually impossible to make any money from OPIS. In fact, the plain objective of these schemes was to lose money.

72.    The OPIS letters asserted they were based on a representation that "all parties acted independently . . . [and that] the parties acted at arm's length." This statement was false or misleading because the co-conspirators were not acting independently, but were carrying out a series of scripted and inter-related transactions.

73.    The partnership agreement that was part of the OPIS strategy provided as follows: "The term of the Partnership commenced on [the relevant date] and will continue until March 31,

2028, or, if sooner, the dissolution of the Partnership and its business is completed and wound up following a cause of dissolution, as provided in Section 16.1 hereof."

74.     These statements were false or misleading because, as each of the co-conspirators knew, to obtain the tax benefits that were the objective of the OPIS, it was essential that each participant's strategy be completed by the end of the calendar year.  In fact, virtually all of the OPIS transactions were completed by the end of the calendar year and within a hundred days from their initiation.

75.     The materially false representations in the opinion letters are attributable to each of the co-conspirators because they were made in furtherance of the conspiracy, and because each of the co-conspirators participated in their formulation.

## II.     THE ESSENTIAL ROLE OF THE DEFENDANTS

76.     The co-conspirators closely coordinated and cooperated in designing and implementing OPIS.  The defendants and the other co-conspirators each had their own primary roles.  KPMG was, along with Presidio, principally responsible for developing and selling OPIS. KPMG attracted clients by using its respected brand and its reputation for tax expertise. It also produced opinion letters, relied upon by the Covey, falsely describing the transactions comprising the tax strategy and falsely asserting that the strategy was legitimate. Brown & Wood added the credibility of a prominent law firm and similarly provided opinion letters falsely asserting that OPIS was legitimate.

77.     Although supposedly an investment advisory firm, Presidio was almost exclusively in the business of selling unlawful tax shelters.  Presidio was founded and controlled by former KPMG tax partner Robert Pfaff and former KPMG senior manager John Larson, and played a central role in designing, implementing and selling OPIS.  Its principals also had

23

important contacts at Deutsche Bank and helped KPMG obtain the financial services from these banks needed to implement OPIS.

78.     For example, in July 1997, one month before Mr. Pfaff left KPMG, he wrote to senior officials in KPMG's tax practice and recommended that KPMG establish a relationship with an investment firm, such as Presidio, to market its tax products.  He expressed his desire for a close relationship between KPMG and Presidio with the "goal of developing mutually beneficial products."

79.     On September 10, 1997, Presidio and KPMG entered into a formal operating agreement with respect to FLIP, a tax shelter product, "and certain other tax advantaged strategies."  Under the terms of this agreement, KPMG offered Presidio the right of first refusal to present FLIP to KPMG clients.  In return, Presidio offered KPMG a right of first refusal to promote all other tax-based products that Presidio developed.  KPMG also committed to using its best efforts to assist in developing and distributing new tax products with Presidio, and to bear the costs of jointly developing such tax products with Presidio.  The operating agreement also set forth a fee schedule for both KPMG and Presidio that factored in the size of the deal and whether KPMG or Presidio initiated contact with the client.  On July 2, 1998, KPMG and Presidio modified and re-executed this agreement.

80.     Pfaff was involved in discussions with KPMG to re-design the FLIP tax shelter, which eventually led to the development of OPIS.  Documents consistently refer to Presidio's principals as part of the OPIS "working group."  For example, a June 1998 email from Gregg Ritchie at KPMG regarding OPIS notes that "Presidio is meeting next week in New York with Brown & Wood to finalize the legal documents required to execute this strategy."

24

81.     Presidio also actively participated in marketing and implementing OPIS.  For example, according to the 2005 Senate Subcommittee Report, Presidio "made numerous presentations to KPMG clients related to FLIP, OPIS, and BLIPS . ... [and] also undertook many actions to implement the transactions called for by the tax products, including by forming partnerships, executing trades, and working with banks to secure client loans and develop the trading strategies for the tax shelter transactions."

82.     A 2005 U.S. Senate Subcommittee Report, described more fully below, found that the tax shelters could not have been executed without the active and willing participation of major banks.  Specifically, the report found that Deutsche Bank and other banks "provided billions of dollars in lending critical to transactions which the banks knew were tax motivated, involved little or no credit risk, and facilitated potentially abusive or illegal tax shelters known as FLIP, OPIS, and BLIPS."  According to the report, Deutsche Bank provided approximately $10.8 billion in lines of credit for OPIS and BLIPS transactions.

83.     In an internal Deutsche Bank memo provided to the Senate Subcommittee with respect to a similar strategy that was created and marketed after OPIS, the strategy is said to have been developed with KPMG and Presidio Advisors.  Moreover, the memo states that "[i]n simple terms, for the Blips project, Deutsche Bank will act as lender, transaction executor, foreign exchange trader, and Know Your Customer Screener."

84.     The involvement of the Deutsche Bank defendants was critical to the success of the fraudulent scheme.  Deutsche Bank was among a small number of financial institutions capable of providing the needed banking and trading services.  The Tax Strategies ostensibly required exotic financial transactions that no financial institution would undertake in the ordinary course of business.  Consequently, they could not be sold unless and until and entity like

25

Deutsche agreed to participate in them. To ensure that the banks would participate, the co-conspirators worked together to structure OPIS to eliminate any credit risk for the banks.

85.    The banks also had to approve, and did approve, false representations as to their role in the tax strategies scheme, including the false assertion that the banks were not acting in concert with the other defendants or co-conspirators. The Senate Report found that "KPMG negotiated intensively with the banks over the factual representations that would be attributed to the banks in the KPMG opinion letters."

86.    As major international financial institutions with considerable tax expertise, the Deutsche Bank defendants were well aware that the Tax Strategies were fraudulent. They were concerned that their role would attract unfavorable publicity and the attention of bank regulators, especially since "know your customer" rules imposed on banks an affirmative duty to investigate their customers and their possible involvement in illegal activities. The Deutsche Bank defendants decided to reduce their risk by splitting their involvement in the transactions between them. They also created false paper trails which purportedly showed that their only role had been as bankers providing routine banking services in the ordinary course of business.

87.    As the co-conspirators were well aware, the banks' involvement with the tax strategy enhanced the apparent legitimacy of the product. An August 30, 1998 memorandum from Randall Bickham in KPMG's Silicon Valley office to Doug Ammerman in the firm's Orange County office discusses KPMG's goal of branding the firm's tax shelter practice as "KPMG-centric with concentric alliances" with "institutions that have exemplary reputations in the capital transactions markets." The memorandum explains that:

> [t]he existing alliances with Deutsche Bank and Brown & Wood
> exemplify this approach. We have used the existing OPIS product
> as the mechanism for establishing close strategic relationships with

26

> Deutsche Bank and Brown & Wood at both an institutional level
> and with key individuals within the organizations. . . . [T]hese
> relationships are critical to our future success. The strategy is to
> co-develop products with Deutsche Bank and Brown & Wood and
> sell into the $1 to $5 million market segment on a joint basis. I
> have discussed the strategy of joint development and marketing
> with both institutions.

88.    The record is replete with additional evidence of the banks' extensive cooperation

with KPMG and Presidio in executing the tax strategy. For example, in a late March 1999 email

entitled "OPIS Update," Greg Richie, a senior KPMG tax partner, noted that he had recently

participated in a conference call involving Deutsche Bank, Presidio, and others from KPMG.

89.    In another example, an August 1998 memorandum authored by KPMG's Randall

Bickham states that Deutsche Bank held meetings with Presidio and KPMG, apparently during

July or August of 1998, to discuss the need for Deutsche Bank to "increase[] their internal deal

capacity and of the need to effectively contract capacity from another financial institution" in

order to facilitate the sale of additional transactions. Prior to these meetings, Deutsche Bank's

limited capacity prevented KPMG from earning more than $10 million in fees. According to the

memorandum, after Bickham "convinced" Deutsche Bank to increase capacity, KPMG was able

"to generate approximately $25 million in KPMG fees."

90.    An attachment to a September 9, 1998 email from Randall S. Bickham of KPMG

demonstrates the close coordination between Deutsche Bank, Presidio, and KPMG in furtherance

of the tax shelter scheme. The attachment was entitled "OPIS Timeline Action Items and

Timeline for Investment Transactions." It was apparently circulated between KPMG, Deutsche

Bank, and Presidio and it outlined the "Responsibilit[ies]" in the coming months for each of

these entities in executing the various OPIS products to ensure that OPIS products sold in 1998

could quickly be set up and then unwound by the end of the year. In case this detailed timetable

27

did not resolve all ambiguity as to which conspirator was responsible for doing what, readers were advised that "[i]f you have any questions please call Kerry Moskalik" of Presidio.

91.    On "Day 1," for example, "KPMG/Investor" was required to provide participants "with information for [opening] DBS accounts." According to the document, "DBS" meant "Deutsche Bank Securities, Inc." Also on day 1, "Presidio Advisors" was required to "Prepare DBS account opening documents and fax to investor." On day 2, KPMG was to "[f]ax the professional reference to Rick Stockton at DBS" at fax number (212) 469-8304. DBS apparently needed such a reference to comply with "know your customer" rules. On day 4, DBS was to ensure that the investors' accounts were opened at DBS. Also on day 4, Presidio was responsible for preparing and sending wire transfer instructions to the investor. On day 5, the investor was to wire a portion of the funds required to DBS.

92.    Although a few tasks were nominally listed as the responsibility of the investor, it does not appear that Covey or other OPIS participants was ever provided with a copy of this schedule of responsibilities. In fact, the responsibility for tasks that were nominally listed as the investor's were assigned not to the investor, but to Deutsche Bank. This was despite the fact that the co-conspirators agreed that KPMG and Brown & Wood could assert in their opinion letters that Deutsche Bank was never an agent of the investor and had always acted independently of the investor.

93.    Knowing that they were participating in a fraudulent scheme, the Deutsche Bank defendants sought to conceal their true role. For example, in a July 1999 e-mail, Ivor Dunbar of Deutsche Bank wrote that with respect to BLIPS (the successor to OPIS), "we have been asked by the Tax Department not to create an audit trail in respect of the Bank's affairs." Moreover, internal e-mails in July 1999 between Deutsche Bank employees Mick Wood and Francesco

28

Piovanetti reveal an intention to use the attorney-client privilege to conceal documents relating to tax strategies. Wood wrote: "I would have thought you could still ensure that…the papers are prepared, and all discussion held, in a way which makes them legally privileged. (…you may remember that was one of my original suggestions.)"

94.     Because officials at Deutsche Bank knew of the fraudulent nature of the tax strategies and were concerned about potential liability, the bank's participation in the scheme had to be approved at a high level. According to the Senate report, final approval for the bank's participation in at least one tax shelter (BLIPS) came from John Ross, Chief Executive Officer of Deutsche Bank Americas. According to the minutes of the meeting at which Ross gave his approval, Ross insisted that the bank should participate in a limited number of the tax strategies, should not participate in any transaction where the taxpayer was "involved in litigation" (presumably with third parties on issues unrelated to the tax strategies), and should maintain a "low profile." Ross insisted that he be kept fully informed on future developments with respect to the tax strategies.

## III.    DEFENDANTS' MARKETING OF OPIS TO COVEY

95.     In late 1997 or early 1998, Covey hired KPMG to prepare his taxes. Covey knew nothing about tax shelters at the time, and was not seeking to participate in a tax shelter.

96.     During 1998, Covey anticipated incurring large capital gains for the tax years 1998 and 1999. KPMG became aware of this fact.

97.     During the Spring of 1998, KPMG began preparing tax projections for Covey. Shortly thereafter, Covey received a telephone call from Bob Pedersen ("Pedersen"), then head of tax planning at KPMG in Chicago. During this telephone conversation, Pedersen told Covey

29

that KPMG could "save Covey millions of dollars in taxes."  Based on this statement, Covey

agreed to meet with Pedersen to explore the possibility of tax savings.

98.    Covey met with Pedersen in June 1998.  During this meeting, Pedersen informed

Covey that KPMG had put together a transaction called "OPIS" which would legally generate

tax losses that could be used to offset Covey's anticipated tax gain.

99.    Pedersen was aware that Covey had no experience with federal tax laws or tax

shelters and was relying on KPMG's expertise and advice in these areas.  Critically, Covey has

no educational background in tax law, or stock or option trading.  His career was in software

development and marketing.  Other than two trades in the stock in the company for which he

worked, Covey did not trade any stocks during the 15 years prior to engaging in OPIS.  Prior to

OPIS, he had never traded options.

100.    In fact, at the June 1998 meeting between Plaintiff and Pedersen, Covey

specifically asked Pedersen if the proposed transaction was legal and Pedersen assured Covey

that it was.

101.    Furthermore, during the June 1998 meeting, Pedersen explained to Covey that the

"investment" KPMG was recommending was called the "Offshore Portfolio Investment

Strategy," and commonly referred to as "OPIS" and provided a description of how the OPIS

transaction worked to generate capital losses.

102.    Covey met with Pedersen and his KPMG tax team again on July 13, 1998 at

KPMG's Chicago offices.  Pedersen went over the OPIS transaction again and once again,

provided assurances to Covey that the OPIS transaction was legitimate.  Pedersen also stated that

KPMG would provide Covey with a written opinion to that effect.  KPMG also informed Covey

that the prestigious law firm of Brown and Wood would provide a written opinion stating that the

transaction was legitimate. Pedersen further assured Covey that these written opinions would insulate him from any tax liability on the OPIS transaction.

103. In addition, during 1998, KPMG partner Pedersen assured Covey OPIS was legitimate and a good tax strategy to pursue.

104. Covey asked KPMG for a meeting with Presidio LLC, which KPMG stated was responsible for executing the OPIS transaction for clients of KPMG.

105. On or about August 5, 1998, Covey met with KPMG representatives, including Pedersen, and Presidio LLC representatives, including John Larson, at KPMG's Chicago offices. At this meeting, KPMG presented Covey with a "nondisclosure agreement" that he was required to sign prior to receiving additional information on the OPIS transaction. Unbeknownst to Covey, KPMG and Presidio LLC required clients to sign this nondisclosure agreement, which required clients to maintain confidentiality and agree not to disclose information provided to that client pertaining to OPIS, pursuant to their plan to attempt to delay attention from the IRS.

106. After Covey signed the nondisclosure agreement, Presidio LLC, aware of Plaintiff's lack of sophistication and knowledge of tax laws and tax shelter products, explained the OPIS transaction step by step and represented to Covey that it had executed the identical transactions for over twenty other clients.

107. At the August 5, 1998 meeting, Covey specifically questioned KPMG and Presidio about the risks of OPIS. KPMG and Presidio assured Covey that OPIS was valid and legitimate, and involved minimal risk. Specifically, KPMG and Presidio told Covey that OPIS had never been challenged. After his meetings with KPMG and Presidio, Covey came away with the impression that he would be foolish if he didn't engage in the OPIS transaction.

31

108.    Moreover, during this same meeting, Covey asked KMPG and Presidio LLC why all taxpayers do not enter into OPIS transactions in order to legally generate tax losses.  KPMG and Presidio LLC responded by boasting of their expertise in this area, stating they were the only entities to come up with offshore investment idea and further stating that setting up a transaction such as OPIS requires a large capital investment and the participation of a large international bank such as Deutsche Bank.  KPMG and Presidio, in other words, touted Deutsche Bank's participation as a barometer of legitimacy and a guarantor of success.

109.    During this meeting, KPMG once again assured Covey that he was "protected" because he would have "two opinions"—one from KPMG and one from Brown and Wood– providing assurances that the transaction was legal.

110.    Covey decided to enter into the OPIS transactions based on his meetings with KPMG and Presidio, KPMG and Presidio's oral assurances regarding the legality of the transaction, and KPMG's assurances that both KPMG and Brown and Wood would provide opinion letters stating that the OPIS transaction was legal.  In making his decision, Covey further relied on the weight of KPMG, Brown and Wood, and Deutsche Bank's reputation and expertise in their respective industries.

111.    At the time that KPMG was marketing the OPIS transactions to Covey in 1998 and 1999, it knew that some of its own tax professionals believed the OPIS transactions to be illegal tax shelters.  For example, in a June 4, 1998 email, Gregg Ritchie ("Ritchie"), a KPMG tax partner, wrote, "I am certain that we have a short time frame to market this strategy before legislation will be effective to shut it down.  Accordingly, the less publicity, the longer the strategy may be available."  In a September 1998 email to colleagues, KPMG tax partner Mark Watson ("Watson") criticized the OPIS strategy's reporting of losses on a separate tax return for

a grantor trust formed for each participant.  "When you put the OPIS transaction together with this "stealth reporting approach, the whole thing stinks."  In January 1999, Watson further wrote, "I believe that we are filing misleading, and perhaps false, tax returns by taking this reporting position."

112.    KPMG nevertheless provided Covey with a written opinion letter dated December 31, 1998 (the "KPMG Opinion Letter") stating the OPIS transaction would legally generate tax losses that could be used to offset Covey's anticipated tax gain.  The KPMG Opinion Letter represented that it was "more likely than not" that the tax treatment of the OPIS transactions would be upheld.

113.    KPMG also provided Covey with a written opinion letter from Brown and Wood dated December 31, 1998 (the "Brown and Wood Opinion Letter") stating that the OPIS transaction was legal under the tax code. Like the KPMG Opinion Letter, the Brown and Wood Opinion Letter also represented that it was "more likely than not that the material tax benefits" from the OPIS transactions "in the aggregate" would be sustained if challenged by the IRS.

114.    Furthermore, KPMG continued to execute the OPIS transaction for Covey during 1999 and in addition, Pedersen contacted Covey in 2000 to ask him if he was interested in participating in more OPIS transactions.  Pedersen did not disclose to Covey that KPMG was no longer marketing OPIS, or that the IRS had determined that OPIS was an illegal tax shelter. Covey, not expecting to incur capital gains in 2000, declined Pedersen's invitation to execute additional OPIS transactions.

115.    KPMG did not file Covey's 1998 tax return until October 1999, yet did not warn or advise Covey to revise his return to eliminate the OPIS related deductions or to amend his return.

IV.     **DEFENDANTS' IMPLEMENTATION OF COVEY'S OPIS TRANSACTION**

116.    Defendants structured the OPIS transaction so that Covey established a revocable trust dated August 7, 1998, Xerxes Trust, of which Covey was the grantor and trustee as well as the beneficial owner, to purchase the stock in the OPIS transactions.

117.    On August 11, 1998, Pedersen sent Covey wire transfer instructions to initiate the OPIS transactions.  Accordingly, on August 24, 1998, Covey wired $1,701,000 and $1,899,000 from to Deutsche Bank in two separate transactions.  On October 13, 1998, Covey wired another $375,000 to Deutsche Bank.  On August 31, 1999, when all was said and done, Deutsche Bank returned $1,513,900.06--$2,461,099.94 less than he had wired initially.  It is unclear to Covey how much of the net amount he sent to Deutsche Bank constituted fees, and to whom such fees were paid.  Covey believes, however, that defendants and the other co-conspirators took hundreds of thousands of dollars of Covey's money as fees.

118.    Covey entered into OPIS transactions in late 1998 and 1999.  Covey's purchases and sales pertaining to the OPIS transactions are itemized in the KPMG Opinion Letter.  Among other things, Deutsche Bank caused Covey to engage in various currency, stock, and options transactions as part of the implementation of OPIS.  Deutsche Bank sent Covey monthly statements showing the status of the transactions in which Covey engaged.  These statements, along with the other documents Deutsche Bank sent, constituted representations that the transactions Deutsche Bank was overseeing were legitimate, purposeful, and suitable for Covey.

119.    As described by KPMG in the KPMG Opinion Letter,

> The basic design of the investment strategy was premised upon the expectation that a highly leveraged position in Foreign Bank [Deutsche Bank] securities would provide Investor [Xerxes Trust] with the opportunity for capital appreciation.  In order to maximize the utilization of foreign capital market credit facilities, Investor

34

entered into a swap transaction. The other participant in the swap
was a foreign (non-U.S.) taxpayer, Almaden Street, LLC ("Limited
Partner"), a limited liability company, that had a 99% limited
partner interest in a Cayman Islands limited partnership, Croton,
L.P. ("Foreign LP") which invested in Foreign Bank Securities.
Investor further increased its investment position in Foreign Bank
by making a direct purchase of Foreign Bank stock and options.

120.    In this particular case, the foreign public company is Deutsche Bank. The OPIS

transaction consists of two investments made in the United States (the Domestic Investments)

and two investments involving a foreign investor (the Foreign Investments). The underlying

stock position (Notional Amount) of the Foreign Investments is Deutsche Bank stock.

121.    The Foreign Investments consisted of the purchase of a Swap Agreement and the

purchase of an option to acquire a 50 percent interest in a foreign entity owned by the above-

described Foreign Investor. The performance of both of these investments was tied to the price

of Deutsche Bank stock during a 46-day period.

122.    The U.S. Investments consisted of the purchase of Deutsche Bank stock and the

purchase of and option to acquire Deutsche Bank stock.

123.    Covey realized a loss from the disposition of these investments that KPMG stated

could be treated as bona fide losses for tax purposes.

124.    Presidio LLC's role in the OPIS transactions was to, among other things, assist

with the transfer of funds and to assist in the execution of the multiple purchases and sales

necessary for their accomplishment. Presidio LLC provided Covey with the necessary

documentation to open an account for Xerxes Trust with Deutsche Bank and sent Covey copies

of the Investment Advisory Agreement and other documents he was required to sign in order to

execute the OPIS transactions. Presidio LLC also apprised Covey of the status of his

investments.

35

125.    Deutsche Bank's role in the OPIS transactions was to act as custodian for the trusts used to accomplish the trades required for the OPIS transactions and to specify the language included in the trust documents used for the OPIS transactions.  Deutsche Bank knew or should have known that the purpose of the OPIS transactions was to generate losses and not for a legitimate business purpose; knew or should have known that the transactions did not arise from bona fide business transactions and therefore would not generate valid and legal tax benefits to participants such as Covey; and that KPMG and the Presidio defendants were marketing the OPIS program by giving participants false assurances as to the validity of the tax benefits that were to be obtained.

## V.    THE IRS INVALIDATES COVEY'S OPIS TRANSACTION

126.    In or about January 18, 2002, Covey received a letter from KPMG advising him that the IRS had determined that the OPIS transaction is illegitimate and that he should voluntarily disclose his participation in the OPIS transactions in order to obtain amnesty on the "section 6662 accuracy related penalty" and to avoid any criminal charges.

127.    Covey disclosed his participation in the OPIS transaction to the IRS in order to reduce the risk of penalties and to stop the running of interest.

128.    Thereafter, the IRS initiated an audit of Covey's 1998 and 1999 tax returns and submitted voluminous IDR requests to Covey.

129.    In February 2002, Covey posted a $4 million bond to the IRS and paid approximately $700,000 to the State of Illinois in order to stop the running of interest.

130.    In April 2003, the IRS offered a settlement to Covey, along with other participants in the OPIS transaction.  Pursuant to the settlement, Covey was allowed 20% of the claimed OPIS based tax benefits, but had to pay 80% of the tax benefits defendants had assured

he would receive back to the IRS. Also, Covey's OPIS expenses were not deductible. The terms of this settlement are contained generally in IRS Announcement 2002-97, "Settlement Initiative for Section 302/318 Basis-shifting Transactions."

## VI.    THE GOVERNMENT INVESTIGATION INTO KPMG AND THE OTHER DEFENDANTS' CONSIPRIRACY

131.    In October 2002, the U.S. Senate Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs ("Senate Subcommittee") began an investigation into the development, marketing, and implementation of abusive tax shelters, including OPIS. In November 2003, the Senate Subcommittee held public hearings and in February 2005, it issued a report entitled "The Role of Professional Firms in the U.S. Tax Shelter Industry," (the "Senate Report"). The report was based on information gathered during two public hearings, numerous interviews and depositions, and the review of over 250 boxes of documents and electronic data.

132.    According to the Senate Report, the U.S. tax shelter industry "aggressively marketed" generic "tax products," including OPIS, and that the implementation of those tax shelters required close collaboration between accounting firms, law firms, investment advisory firms, and banks. (According to the Senate Report, for example, KPMG sold OPIS to more than 111 individuals and in so doing, earned fees in excess of $28 million dollars.)

133.    Further, according to the Senate Report, KPMG considered registering OPIS as a tax product, but decided not to because the IRS was not vigorously enforcing this requirement and because KPMG "coldly calculated" that the potential penalties were less than the potential profits.

134.    Among other things, the Senate Report contained the following findings:

(a)     "[t]he sale of potentially abusive and illegal tax shelters has become a lucrative business in the United States, and some professional firms such as accounting firms, banks, investment advisory firms, and law firms are major participants in the mass marketing of generic "tax products" to multiple clients."

(b)     "Although KPMG denies being a tax shelter promoter, the evidence establishes that KPMG has devoted substantial resources to, and obtained significant fees from, developing, marketing, and implementing potentially abusive and illegal tax shelters . . . ."

(c)     "KPMG used aggressive marketing tactics to sell its generic tax products by turning tax professionals into tax product salespersons, pressuring its tax professional to meet revenue targets, using telemarketing to find clients, developing an internal tax sales force, using confidential client tax data to find clients, targeting its own audit clients for sales pitches, and using tax opinion letters and insurance policies as marketing tools."

(d)     "KPMG was actively involved in implementing the tax shelters which it sold to its clients, including by enlisting participation from banks [including Deutsche Bank], investment advisory firms [including the Presidio defendants], and tax exempt organizations; preparing transactional documents, arranging purported loans; issuing and arranging opinion letters; providing administrative services; and preparing tax returns."

(e)     KPMG's fee structure, which was not based on hourly work, was improper and a violation of ethical rules;

(f)     Prior OPIS being approved for sale in September 1998 by KPMG, a senior KPMG tax professional wrote a 7 page memorandum criticizing the OPIS product in February 1998, stating that OPIS was "smoke and mirrors" and "failure to use an independent 3rd party in any of the transactions indicates that the deal is pre-wired."

(g)     Presidio LLC knew the possibility of profit from the OPIS transactions was remote;

(h)     "Some major banks and investment advisory firms have provided critical lending or investment services or participated as essential counter parties in potentially abusive or illegal tax shelters sold by KPMG in return for substantial fees or profits."  Moreover, Deutsche Bank knew the strategies were "tax motivated, involved little or no credit risk, and facilitated potentially abusive or illegal tax shelters," including OPIS.  The tax shelters examined by the Senate Committee, including OPIS, "could not

38

have been executed without the active and willing participation of major banks."

(i)     "Some law firms have provided legal services that facilitated KPMG's development and sale of potentially abusive or illegal tax shelters, including by providing design assistance or collaborating on allegedly 'independent' opinion letters representing to clients that a tax product would withstand an IRS challenge, in return for substantial fees." (p.4)

(j)     The Presidio defendants "played a key role in three of the KPMG tax shelters," including OPIS. Presidio "also played a key role in marketing and implementing" OPIS. "For example, Presidio made numerous presentations to KPMG clients related to . . . OPIS . . . . Presidio also undertook many actions to implement the transactions called for by the tax products, including by forming partnerships, executing trades, and working with banks to secure client loans and develop the trading strategies for the tax shelter transactions."

(k)     "The evidence raises serious questions about the independent status of Sidley Austin Brown & Wood in issuing the legal opinion letters supporting the KPMG products. The evidence indicates . . . that KPMG collaborated with the law firm ahead of time to ensure it would supply a favorable opinion letter. In many cases, the law firm apparently issued its letter without ever speaking with the client to whom the tax advice was directed." (p.12)

(l)     Deutsche Bank participated in about 60 OPIS transactions in 1998 and 1999 and earned more than $33 million in doing so.

(m)     The Presidio defendants and related entities made at least $12 million off of OPIS-related transactions.

135.    As described above, in a civil settlement with the federal government, KPMG paid over $400 million.

136.    Moreover, as described above, numerous KPMG, Brown & Wood, and Presidio employees have been indicted for their role in connection with the marketing of tax shelters, including OPIS.

137.    Finally, KPMG and Brown & Wood paid close to $200 million to settle a class action concerning the firms' marketing of tax shelters, including OPIS.

## VII.   COVEY HAS SUFFERED SUBSTANTIAL DAMAGES

138.    But for Defendants' material misrepresentations and misleading omissions, Covey would not have entered into the OPIS transactions, paid for tax advice, paid millions of dollars in additional expenses to execute the OPIS transactions, foregone legitimate tax savings opportunities, filed a federal tax return that reflected deductions for capital losses resulting from the OPIS transactions and failed to amend his 1998 and 1999 tax returns, thereby incurring additional penalties and interest.

139.    The back taxes that Covey had to pay, which are recoverable in Illinois, are believed to be as follows:

| Federal Back Taxes | Federal Tax Benefit Allowed | Illinois Back Taxes | Illinois Tax Benefit Allowed | Net Federal and Illinois Back Taxes |
|---|---|---|---|---|
| $3,137,906 | ($379,888) | $652,060 | ($139,204) | $3,270,874 |

Had Covey not engaged in OPIS, he would have explored and engaged in other legitimate and lawful tax saving opportunities.

140.    Separate and apart from these back taxes, Covey incurred substantial out-of-pocket losses in connection with OPIS.  Such losses are believed to be as follows:

| Trading Losses and Fees | Other Fees, Costs, and Expenses | Interest | Total Out-of-Pocket Losses |
|---|---|---|---|
| $2,461,099.94 | $158,812.26 | $278,289.38 | $2,898,201.58 |

Fees to defendants and the other co-conspirators are included in the total trading losses and fees set forth above.  And other fees, costs, and expenses represents amounts paid in connection with the IRS's audit of Covey.  The interest set forth herein is interest Covey paid to the IRS and the State of Illinois before Covey paid additional sums (including a bond) to stop the running of interest.

40

141.    In connection with the *Simon v. KPMG* settlement described above, Covey received $1,167,150.58 net of attorneys' fees and costs.  Thus, not counting pre-judgment interest or punitive damages, as a direct and proximate result of defendants' actions, Covey has still suffered at least $1.7-$2.1 million in damages for which he has not been compensated.

142.    Defendants' fraudulent misrepresentations and material omissions were malicious and in reckless disregard of Covey's rights.  They constituted gross deception and willful and wanton misconduct, for which Covey is entitled to punitive or exemplary damages.

## Count I – Civil Conspiracy

143.    Covey repeats and realleges paragraphs 1-142 as if fully set forth herein.

144.    As described more fully above, the defendants and other co-conspirators knowingly entered into an agreement to participate in a scheme to create and market OPIS and to induce Covey to enter into the illegal OPIS transaction in order to obtain professional and other fees from Covey.  In so doing, defendants and the other co-conspirators acted with full awareness that the OPIS transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions with economic substance from an investment standpoint, which features would have been necessary for a successful and legal tax strategy.

145.    Defendants acted in their respective roles as described above according to a predetermined and commonly understood accepted plan of action (i.e., the defendants' arrangement), all for the purposes of obtaining professional fees from Covey and other OPIS participants.

146.    The acts of the co-conspirators were contrary to law and included fraudulent misrepresentation, negligent misrepresentation, malpractice, and breaches of fiduciary duty.

147.    The co-conspirators, including defendants, agreed to commit the unlawful acts alleged herein.  There was a meeting of the minds among the defendants and the other co-conspirators to commit the unlawful acts alleged herein.

148.    Each of the defendants acted in the respective roles described above according to a predetermined and commonly understood and accepted plan to further the conspiracy.  Each committed unlawful acts in furtherance of the conspiracy.

149.    The defendants' actions were contrary to numerous provisions of law.

150.    The defendants' agreement and unlawful actions pursuant to and in furtherance of the common scheme described above proximately caused Covey's damages as previously set forth herein.

151.    Each defendant is liable for the misrepresentations and omissions made by each of the other defendants as a principal and co-conspirator.

152.    As a result of defendants' conduct set forth herein, Covey has been injured.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against defendants, jointly and severally, as follows:

(a)    An award of compensatory damages to be established definitively at trial;

(b)    An award of appropriate prejudgment interest;

(c)    An award of punitive or exemplary damages; and

(d)    Such other relief as this Court deems reasonable, necessary, and just.

**Count II – Common Law Fraud**

153.    Covey repeats and realleges paragraphs 1-142 as if fully set forth herein.

154.    As set forth above, defendants knowingly made numerous false statements of material fact and intentionally omitted material facts from Covey, including: (1) persuading

42

Covey to enter into the OPIS transaction; and (2) at all times, conveying that the transaction was valid and legitimate. The Presidio defendants were heavily involved in the creation of OPIS, the marketing of OPIS to Covey, and in OPIS's implementation. The Deutsche Bank defendants were heavily involved in the creation of OPIS, but also in its implementation with respect to Covey. On numerous occasions, including through the use of monthly account statements, the Deutsche Bank defendants conveyed that the transactions underlying OPIS were valid, legitimate, purposeful, suitable for Covey, and had a reasonable prospect of profit. Moreover, the Deutsche Bank defendants knew that KPMG, Brown & Wood, and Presidio were making false statements and omitting material facts from Covey in order to induce plaintiff to participate in OPIS.

155. The above affirmed representations and omissions made by each defendant were false, misleading, and material when made or omitted and the defendants knew these representations and omissions to be false, misleading, and material when made or omitted with the intention that Covey would rely upon them in entering into the OPIS transaction and pay them substantial fees.

156. Defendants had a duty to disclose the material facts that it concealed from Covey.

157. Covey would not have agreed to invest in the OPIS transaction if he had known of defendants' omissions or that defendants' representations were false.

158. Covey could not have discovered the concealed information through reasonable inquiry or inspection.

159. Covey reasonably relied to his detriment upon the truth of defendants' material misrepresentations and omissions of material fact in deciding to enter into the OPIS transactions, in paying large fees to defendants for tax advice, and in sticking with OPIS throughout the

43

transactions. Moreover, Covey did not avail himself of legitimate tax savings opportunities and deductions, filed federal and state tax returns in 1999 and 2000 that reflected deductions for losses resulting from OPIS and the Defendants' fees and did not promptly amend those returns, thereby incurring substantial back taxes and out-of-pocket losses.

160.    But for defendants' intentional misrepresentations and material omissions described above, Covey would never have hired defendants for advice on the OPIS transaction, engaged in the OPIS transaction, claimed the purportedly resulting losses on their income tax returns, or filed and signed their 1999 and 2000 tax returns prepared in accordance with Brown & Wood's opinion letter or in reliance on Defendants' advice, and otherwise failed to avail himself of legitimate tax savings opportunities and deductions.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against defendants, jointly and severally, as follows:

(a)    An award of compensatory damages to be established definitively at trial;

(b)    An award of appropriate prejudgment interest;

(c)    An award of punitive or exemplary damages; and

(d)    Such other relief as this Court deems reasonable, necessary, and just.

### Count III – Negligent Misrepresentation

161.    Covey repeats and realleges paragraphs 1-142 as if fully set forth herein.

162.    Defendants were in the business of giving information and guidance to clients to be used in those clients' business transactions.

163.    Accordingly, defendants had a duty to communicate accurate information to Covey.

44

164.    Defendants (as alleged above), made false statements of material fact and omitted to disclose material facts to Covey.  Ultimately, defendants knew or should have known that OPIS was not a legitimate tax strategy, but continuously pretended otherwise to Covey. Defendants intentionally or negligently failed to disclose this information to Covey.

165.    Covey would not have agreed to invest in the OPIS transaction if he had known that defendants' representations were false or if he had been aware of the material omissions.

166.    Defendants were careless or negligent in failing to ascertain the truth of the statements they made to Covey and in failing to disclose all the material facts relevant to the OPIS transaction.

167.    In making the material misstatements and omitting to disclose material facts, defendants intended to induce Covey to invest in the OPIS transaction and pay large fees to defendants.

168.    Defendants' intentional omissions were made willfully, wantonly, or recklessly to Covey to induce the purchase of OPIS.

169.    Covey reasonably relied upon the truth of defendants' statements in deciding to invest in the OPIS transactions, in agreeing to pay large fees to defendants, and in taking the other actions prescribed by defendants and the other co-conspirators.

170.    But for defendants' intentional misrepresentations and material omissions described above, Covey would never have participated in OPIS.

171.    As a result of his reliance on defendants' material misrepresentations and omissions of material fact, Covey has suffered substantial damages.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against defendants, jointly and severally as follows:

(a)    An award of compensatory damages to be established definitively at trial;

(b)    An award of appropriate prejudgment interest;

(c)    An award of punitive or exemplary damages; and

(d)    Such other relief as this Court deems reasonable, necessary, and just.

## Count IV – Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act

172.    Covey repeats and realleges paragraphs 1-142  as if fully set forth herein.

173.    Defendants engaged in unfair and deceptive business acts and practices described above, in violation of Section 2 the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*

174.    Defendants' unfair and deceptive acts and practices occurred in the conduct of trade and commerce, including offering the OPIS tax shelter product for sale.

175.    Defendants used or employed deception, fraud, false pretense, false promise, misrepresentation and the concealment, suppression or omission of material facts with intent that Covey rely upon the misrepresentation, concealment, suppression or omission of such material facts.

176.    Defendants actions were taken with actual or deliberate intention to harm Covey, or if not intentional, with an utter indifference to or the conscious disregard for the injury to Covey.

177.    Defendants' unfair and deceptive acts and practices caused Covey substantial damages.

178.    Defendants' actions occurred in the course of conduct involving trade or commerce within the State of Illinois, namely the marketing and implementation of tax and investment advice and implementation.

179.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10a(c), allows a court to award attorney's fees and costs to a prevailing Covey.

WHEREFORE, plaintiff respectfully requests that the Court enter judgment in his favor and against defendants, jointly and severally, as follows:

(a)    An award of compensatory damages to be established definitively at trial;

(b)    An award of appropriate prejudgment interest;

(c)    An award of punitive or exemplary damages;

(d)    Attorneys' fees and costs as provided by statute; and

(e)    Such other relief as this Court deems reasonable, necessary, and just.

### Count V – Assisting in the Breach of Fiduciary Duty

180.    Covey repeats and realleges paragraphs 1-142  above as if fully set forth herein.

181.    KPMG and Brown and Wood owed fiduciary duties to Covey to exercise their best care, skill, judgment and compliance with the applicable codes of professional and ethical responsibility.

182.    KPMG and Brown and Wood breached their fiduciary duties to Covey by, among other things, advising him to engage in the OPIS transaction, which KPMG and Brown and Wood knew or should have known to be improper, for the sole purpose of generating large fees and profits for themselves, by not providing complete and truthful information to Covey when promoting OPIS, and by KPMG advising Covey to sign and file the tax return prepared by KPMG in reliance on KPMG's advice.

47

183.    The Deutsche Bank defendants and the Presidio defendants knew of KPMG and Brown & Wood's fiduciary duties to Covey, and knew of KPMG and Brown & Wood's breaches thereof.

184.    Defendants knew or should have known that KPMG and Brown & Wood were acting as unregistered promoters of tax shelters and concealed that fact and its implications from Covey in order to obtain substantial fees.

185.    Defendants induced and participated in these fiduciary breaches by persuading Covey to engage in OPIS, by providing the facilities for and acting as the counterparty in the currency, options, and stock transactions, by providing substantial assistance to and playing a substantial role in the defendants' arrangement, and by remaining silent and failing to inform Covey that OPIS would not provide Covey with legitimate tax losses, or with any reasonable prospect of profits, which Defendants knew was an expectation that Covey had.

186.    Defendants benefited from KPMG and Brown & Wood's breach of fiduciary duties by receiving fees from Covey.

187.    Covey did not know, nor could he have reasonably known, that he was injured by defendants' assistance of KPMG and Brown & Wood's breach of fiduciary duties or that such injury was wrongfully caused until he learned that the IRS was disallowing capital losses for the OPIS transactions.

188.    An award of punitive damages based on the defendants' assistance in KPMG and Brown & Wood's breach of fiduciary duty is appropriate because defendants acted willfully or with such gross negligence as to indicate a wanton disregard for Covey's interests and rights.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against defendants, jointly and severally, as follows:

(a)     An award of compensatory damages to be established definitively at trial;

(b)     An award of appropriate prejudgment interest;

(c)     An award of punitive or exemplary damages; and

(d)     Such other relief as this Court deems reasonable, necessary, and just.

Dated: February 28, 2008                    Respectfully submitted,

                                            ROGER E. COVEY


                                            By:_____/s/ Scott F. Hessell_____
                                                    One of his Attorneys

Bruce S. Sperling (2687925)
Adam P. Merrill  (6229850)
Scott F. Hessell (6275119)
SPERLING & SLATER
55 West Monroe St., Suite 3200
Chicago, Illinois 60603
(312) 641-3200

49